UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| DAVID CARMICHAEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV-08-402-B-W |
| | ) | |
| VERSO PAPER, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE THE TESTIMONY OF GORDON T. CALDWELL, M.D.**

On August 1, 2006, Verso Paper, LLC (Verso) terminated David Carmichael's employment because he had not worked for twelve consecutive months. Mr. Carmichael filed disability discrimination and whistleblower actions against Verso, claiming that its termination violated state and federal law. Verso moved for summary judgment on all claims and also moved under *Daubert* to exclude portions of the anticipated testimony of Mr. Carmichael's physician expert.[1] With the exception of Mr. Carmichael's state whistleblower's claim, which the Court concludes is preempted by federal law, the Court denies Verso's motion for summary judgment. Because Mr. Carmichael's expert has a sufficient foundation upon which to base his medical opinions, the Court also denies Verso's *Daubert* motion to exclude his testimony.

**I.   STATEMENT OF FACTS[2]**

Mr. Carmichael was employed by International Paper Company (IP) from April 2000 until August 1, 2006. *Pl.'s Statement of Material Fact* at ¶ 104 (Docket # 46) (*PSMF*); *Def.'s*

---

[1] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).
[2] Consistent with the "conventional summary judgment praxis," the Court recounts the facts in the light most favorable to Mr. Carmichael's theory of the case, consistent with record support. *Gillen v. Fallon Ambulance Serv.*, 283 F.3d 11, 17 (1st Cir. 2002).

*Statement of Material Fact* at ¶ 1 (Docket # 31) (*DSMF*).  On August 1, 2006, Verso purchased the mill from IP.  *PSMF* at ¶ 104; *DSMF* at ¶ 1.  As of Verso's purchase, Mr. Carmichael was employed as a dual millwright/pipefitter.  *PSMF* at ¶ 104; *DSMF* at ¶ 2.[3]

Mr. Carmichael suffered several work injuries that necessitated physical restrictions. *PSMF* at ¶ 105; *DSMF* at ¶ 2.  Because of a 2002 back injury, Mr. Carmichael could not lift more than 50 pounds; because of a 2003 repetitive use injury in his arms, Mr. Carmichael needed to "pace" his work, limiting the frequency of grasping and repetitive hand use, and could not lift more than 25 pounds; and, because of a crushing injury to his chest in February 2005, Mr. Carmichael had to limit spinal torsion and for a time could not operate fork trucks.  *PSMF* at ¶¶ 105, 107.

As a result of these last restrictions, IP temporarily assigned Mr. Carmichael to work as a planner's assistant from July 2005 to March 2006, but in March 2006, Mr. Carmichael returned to work as millwright/pipefitter.  *Id.* at ¶¶ 109, 110.  When Verso purchased IP in August 2006, Mr. Carmichael was working as a millwright/pipefitter pursuant to various restrictions that limited the frequency and weight of lifting, twisting, climbing, grasping, and repetitive hand movements.  *PSMF* at ¶ 105; *DSMF* at ¶ 10.[4]  Mr. Carmichael experienced an increase in pain during the summer of 2006.  *PSMF* at ¶ 123.[5]

On August 24, 2006, Verso suspended Mr. Carmichael from work for an unrelated job incident.  *PSMF* at ¶ 124; *DSMF* at ¶ 14.  Mr. Carmichael was scheduled to return to work on November 3, 2006 but at the return to work meeting an issue arose as to his work restrictions.

---

[3] As a "millwright/pipefitter," Mr. Carmichael was qualified to perform the tasks of both a millwright and a pipefitter.  The parties vigorously contest the essential functions of the millwright and pipefitter positions.  *Compare PSMF* at ¶¶ 11-13 *with DSMF* at ¶¶ 11-13.

[4] Although it is uncontested that Mr. Carmichael was working pursuant to work restrictions, the parties hotly contest whether the restrictions prevented Mr. Carmichael from performing the essential functions of his position.  *Compare PSMF* at ¶ 110 *with DSMF* at ¶ 16.  The Court addresses this issue in more detail later.

[5] The parties contest whether Mr. Carmichael experienced a new injury in the summer of 2006.  *Compare PSMF* at ¶ 123 *with DSMF* at ¶¶ 17-19.

*PSMF* at ¶ 127; *DSMF* at ¶¶ 22, 23.  Verso stated, based on a recent Worker's Compensation Commission decree relating to his February 2005 chest injury, that Mr. Carmichael could return to work without restrictions.  *Id.*  Mr. Carmichael disagreed and produced two letters from his treating physicians (M-1 forms) listing his restrictions.  *PSMF* at ¶ 127; *DSMF* at ¶ 22.  Verso refused to let him return to work before he met with Dr. Craig Curtis, Verso's mill doctor. *PSMF* at ¶ 128; *DSMF* at ¶¶ 24, 25.

On November 6, 2006, Mr. Carmichael met with Dr. Curtis.  *PSMF* at ¶¶ 127-29; *DSMF* at ¶ 26.  Dr. Curtis, at a minimum, had reviewed the worker's compensation decree and the two M-1 forms.  *Id.*[6]  Dr. Curtis stated that he did not have enough information to make a medical judgment, did not allow Mr. Carmichael to return to work, and requested Mr. Carmichael's medical records.  *PSMF* at ¶ 130; *DSMF* at ¶ 27.  The medical records were provided in December 2006 and Mr. Carmichael authorized Dr. Curtis to access his IP medical file.  *PSMF* at ¶ 132; *DSMF* at ¶ 28.[7]  Mr. Carmichael had met with both his treating physicians in the fall: with Dr. Gordon Caldwell about his chest and back injury, *DSMF* at ¶ 19, and with Dr. Richard Flaherty about his wrist injury.  *Id.* at ¶ 21.  In response to a request by Dr. Curtis, Drs. Caldwell and Flaherty provided information regarding Mr. Carmichael's restrictions in January 2007. *DSMF* at ¶¶ 32, 34.

Another return to work meeting was held on January 8, 2007.  *PSMF* at ¶ 133; *DSMF* at ¶ 31.  Mr. Carmichael requested accommodation, but Verso stated that the company did not have sufficient information about Mr. Carmichael's restrictions to allow him to return to work.  *PSMF* at ¶ 136; *DSMF* at ¶ 31.  Verso contacted the two doctors for clarification.  *DSMF* at ¶ 31.  In

---

[6] The parties contest what information Dr. Curtis had reviewed prior to the meeting.  Mr. Carmichael asserts that Dr. Curtis had additionally reviewed the medical exam performed by Dr. Michael Mainen (Dr. Mainen), the doctor hired by the worker's compensation insurance company, and Mr. Carmichael's injury history.  *PSMF* at ¶ 132.
[7] The parties contest what information was provided in December 2006.  Mr. Carmichael alleges that Dr. Curtis received all his medical records; Verso alleges that Dr. Curtis only received a portion of the records.

February 2007, Dr. Caldwell and Dr. Flaherty submitted health assessment forms to Verso. *PSMF* at ¶ 149.

On March 6, 2007 Mr. Carmichael filed a charge of discrimination with the Maine Human Rights Commission (MHRC) alleging that Verso was preventing him from working in retaliation for various whistle-blowing activities. *PSMF* at ¶ 154. During a March 26, 2007 return to work meeting, Verso reiterated that it had insufficient information about Mr. Carmichael's restrictions to return him to work. *PSMF* at ¶ 151. On April 19, Verso again requested additional information from both Dr. Caldwell and Dr. Flaherty, which both doctors provided. *PSMF* at ¶ 152. A final return to work meeting was held on June 5, 2007 in which Verso refused to allow Mr. Carmichael to be removed from disability leave. *PSMF* at ¶ 158. On July 5, 2007, Dr. Caldwell met with Mr. Carmichael and sent forms describing his restrictions to Verso. On July 10, 2007, Dr. Mainen examined Mr. Carmichael and the results were sent to Verso. *PSMF* at ¶ 160. On September 9, 2007, Verso terminated Mr. Carmichael pursuant to the Collective Bargaining Agreement (CBA) because he had not worked for twelve consecutive months. *PSMF* at ¶ 168; DSMF at ¶¶ 58-60.

On October 29, 2008, Mr. Carmichael filed a complaint in state court against Verso for disability discrimination under the American with Disabilities Act (ADA) and the Maine Human Rights Act (MHRA). *Compl.* (Docket # 1-2); he also alleged whistleblower retaliation under the Maine Whistleblower's Protection Act (MWPA) and the MHRA. On November 21, 2008, Verso removed the action to this Court based on diversity. *Notice of Removal* (Docket # 1). On July 10, 2009, Verso filed a Motion for Summary Judgment, *Mot. for Summ. J.*, (Docket # 21), and on the same day, filed a Motion to Exclude the Testimony of Gordon T. Caldwell, M.D. *Mot. to Exclude the Testimony of Gordon T. Caldwell, M.D.* (Docket # 22) (*Mot. to Exclude*).

On July 30, 2009, Mr. Carmichael filed an Opposition to Defendant's Motion to Exclude the Testimony of Gordon T. Caldwell. (Docket # 36) (*Opp'n to Exclusion*). On August 10, 2009, Verso filed a Response in Support of its Motion to Exclude the Testimony of Gordon T. Caldwell. (Docket # 38) (*Resp. in Supp. of Exclusion*). On August 20, 2009, Mr. Carmichael filed a Response in Opposition to the Motion for Summary Judgment. (Docket # 44) (*Opp'n to Summ. J.*). On September 14, 2009, Verso filed a Reply to the Response in Opposition to the Motion for Summary Judgment. (Docket # 52) (*Reply to Opp'n to Summ. J.*).

## II.  DISCUSSION

### A.    Exclusion of Dr. Caldwell's Testimony

Verso has moved to exclude Dr. Caldwell's evidence. *Mot. to Exclude*. Verso acknowledges that Dr. Caldwell is "qualified as an expert by knowledge, skill, experience, training, or education" and that his proposed testimony is "the product of reliable principles and methods." Fed. R. Evid. 702. The crux of Verso's motion is that when Dr. Caldwell rendered his expert opinions at his deposition, he did not have a sufficient factual foundation upon which to base his medical judgments. It contends that his opinions are based on such a shaky foundation that they should be inadmissible at the summary judgment stage and later at trial. *Resp. in Supp. of Exclusion* at 4-5.

The adequacy of an evidentiary foundation for the admissibility of an expert opinion can be properly challenged with a *Daubert* motion. One of Rule 702's requirements is that the expert testimony must be "based on sufficient facts or data," Fed. R. Evid. 702, and the Supreme Court imposes a gate-keeping function on the trial judge "to ensure that an expert's testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *United States v. Mooney*, 315 F.3d 54, 62 (1st Cir. 2002) (quoting *Daubert*, 509 U.S. at 597). Nevertheless,

5

exclusion of expert testimony under *Daubert* for lack of foundation is rare for at least a couple of reasons.

First, when the adequacy of the foundation for the expert testimony is at issue, the law favors vigorous cross-examination over exclusion. The Court addressed a similar question in *Brown v. Wal-Mart Stores, Inc.*:

> The Defendant's *in limine* assault on the factual basis underlying [the expert's] conclusions is misplaced. As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. *Larson v. Kempker*, 414 F.3d 936, 941 (8th Cir. 2005) (quotations and citations omitted); *see also Brown v. Wal-Mart Stores, Inc.*, 198 F.3d 244, 1999 WL 1111514, at *3 (6th Cir. 1999) (per curiam) (unpublished opinion) ("[W]here . . . opposing counsel [has] the opportunity to cross-examine an expert witness as to a factual basis, exclusion of the testimony is generally inappropriate."); *Hose v. Chicago Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995); *Loudermill v. Dow Chem. Co.*, 863 F.2d 566, 570 (8th Cir. 1988); *United States v. 0.161 Acres of Land*, 837 F.2d 1036, 1040 (11th Cir. 1988); *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."); *Dixon v. Int'l Harvester Co.*, 754 F.2d 573, 580 (5th Cir. 1985); *Twin City Plaza, Inc. v. Cent. Sur. & Ins. Corp.*, 409 F.2d 1195, 1203 (8th Cir. 1969). It is only if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded on foundational grounds. *Larson*, 414 F.3d at 941 (quotations and citation omitted); *see also Loudermill*, 863 F.2d at 570; *Viterbo*, 826 F.2d at 422. Rather than exclude [the expert's] testimony on foundational grounds, this Court would instead allow Defendant to challenge the persuasiveness of his opinions through cross-examination. *See Larson*, 414 F.3d at 941; *Brown*, 198 F.3d 244, 1999 WL 1111514, at *3; *Hose*, 70 F.3d at 974; *Loudermill*, 863 F.2d at 570; *0.161 Acres of Land*, 837 F.2d at 1040; *Viterbo*, 826 F.2d at 422.

402 F. Supp. 2d 303, 308-09 (D. Me. 2005) (internal quotations omitted); *Microfinancial, Inc. v. Premier Holidays In't, Inc.*, 385 F.3d 72, 80 (1st Cir. 2004) (stating that "Rule 702 is not so wooden as to demand an intimate level of familiarity with every component of a transaction or device as a prerequisite to offering expert testimony").

A *Daubert* foundational issue would be fairly raised if the parties agreed on the set of facts underlying the opinion and the opponent contended that the agreed-upon facts were inadequate to support the opinion.[8]  But, more typically, as here, a party's objection about the foundation for an expert opinion is a discovery dispute in *Daubert* clothing.  Experts invariably rely on information provided by the parties in forming their opinions and they must be able to respond to the additional information as that information is discovered, some of which may be revealed during trial itself.  A trial is not scripted; evidence is rarely, if ever, presented in precisely the same way it was discovered, and an expert must be able to react.

The relatively fluid nature of trial does not, of course, mean that the proffering party can withhold vital information or spring a new opinion on the opponent, and the rules contain numerous mechanisms, including witness exclusion, to avoid unfair surprise or prejudice from belated or incomplete disclosure of facts or data upon which the expert relies.  Fed. R. Civ. P. 37.  Here, however, Verso is not complaining that it did not have the information upon which it contends Dr. Caldwell should have relied; Verso has a written job description for both the millwright and pipefitter positions and it is Verso's mill.  Instead, it is complaining that Dr. Caldwell did not review sufficient information about the millwright/pipefitter jobs at the Verso mill before he expressed his expert opinions.  At its heart, this is not a *Daubert* dispute.  It is a discovery dispute about whether Dr. Caldwell should be allowed to backfill his earlier expressed opinion with additional information.[9]

---

[8] For example, if the parties amassed all relevant medical records, which do not include the results of a test the opponent contends is critical for a particular medical diagnosis, a doctor's opinion could be challenged because it is not based on "sufficient facts or data."  Fed. R. Evid. 702.

[9] For example, Verso asserts that "Plaintiff cannot cure this defect in Dr. Caldwell's opinion by raising the possibility that he could introduce evidence of different foundational facts at trial."  *Resp. in Supp. of Exclusion* at 5.  Whether Mr. Carmichael should be allowed to supplement Dr. Caldwell's designation to include additional foundational information or allowed to testify without a supplemental designation is not a *Daubert* issue.  It is a discovery problem.

Moreover, the Court disagrees with Verso's premise. During his deposition, Dr. Caldwell agreed that Mr. Carmichael was able to perform the essential functions of the millwright/pipefitter job with accommodations by his employer. *Caldwell Dep.* at 109 (Docket # 32-6). When pressed about the foundation for his opinion, Dr. Caldwell testified that he had read Mr. Carmichael's job description as a millwright, *id.* at 111, that he "recalled[ed] talking to [Mr. Carmichael] about what a millwright does," *id.*, that he knew the various job assignments that Mr. Carmichael had described to him, *id.* at 112, and that he received no information that "David Carmichael was having problems carrying out his millwright duties." *Id.* at 106.[10] In the Court's view, this foundation is sufficient to allow Dr. Caldwell's opinion. *Rooney v. Sprague Energy Corp.* (*Rooney I*), 519 F. Supp. 2d 120, 128-29 (D. Me. 2007). Taken together, the evidentiary foundation for Dr. Caldwell's opinion does not violate the Rule 702 requirement of "sufficient facts or data." Fed. R. Evid. 702; *Crowe v. Marchand*, 506 F.3d 13, 16-18 (1st Cir. 2007) (describing the "broad latitude" given the district court in the determination of the admissibility of expert testimony).

At trial, Verso is free to vigorously explore whether Dr. Caldwell's opinions, both at the trial itself and at the deposition, are sufficiently well grounded to be persuasive. In the more immediate context of a motion for summary judgment, the evidence must be viewed in the light most favorable to the respondent, and the Court accepts Dr. Caldwell's expert opinion on Mr. Carmichael's ability to perform the assigned work at Verso. For both trial and summary judgment purposes, Verso's objections to Dr. Caldwell's proposed testimony go to weight and credibility, not admissibility. *Microfinancial,* 385 F.3d at 81 (quoting *Int'l Adhesive Coating Co.*

---

[10] The Court does not find it significant that Dr. Caldwell only mentioned "millwright" in his answers. Throughout the deposition, the job descriptions for millwright and millwright/pipefitter were used interchangeably and the questions in the instant examples, asked by attorneys representing both Mr. Carmichael and Verso, only referred to millwright.

*v. Bolton Emerson Int'l*, 851 F.2d 540, 545 (1st Cir. 1988) (stating that "[w]hen the factual underpinning of an expert's opinion is weak, it is a matter affecting the weight and credibility of the testimony—a question to be resolved by the jury")).

Verso also objects on foundational grounds to Dr. Caldwell's testimony that Mr. Carmichael "had a physical impairment that substantially limited one or more of his major life activities."[11] *Mot. to Exclude* at 9 (quoting *Caldwell Dep.* at 76).[12]   The Court rejects Verso's position on this question largely for the reasons just explained.

The Court denies Verso's motion to exclude Dr. Caldwell's expert opinion testimony.

**B.     Summary Judgment**

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).   For summary judgment purposes, "'genuine' means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a 'material fact' is one which might affect the outcome of the suit under the governing law." *Buchanan v. Maine*, 469 F.3d 158, 166 (1st Cir. 2006) (quoting *Seaboard Sur. Co. v. Town of Greenfield,* 370 F.3d 215, 218-19 (1st Cir. 2004)) (internal quotation marks omitted).   Although the Court "constru[es] the record in the

---

[11] Verso does not object to Dr. Caldwell expressing an opinion on the ultimate issue, *see* Fed. R. Evid. 704(a), but contends that his opinion lacks an appropriate foundation. *Mot. to Exclude* at 10.

[12] This issue is not before the Court in the pending motion for summary judgment.   In its motion, Verso states that summary judgment is appropriate, in part, because the "Plaintiff cannot establish that he was qualified [under the ADA]." *Mot. for Summ. J.* at 1.   Verso argues that Mr. Carmichael is not "qualified" because he cannot perform the essential functions of millwright/pipefitter, not that Mr. Carmichael lacked a qualifying disability. *Id.* at 10.   In fact, Verso makes its case, "[a]ssuming solely for this motion that Plaintiff had a disability." *Id.*

Mr. Carmichael, in his Opposition to the Motion for Summary Judgment, states, in two footnotes, that "Verso has not, for purposes of summary judgment, contested the first prong [of the disability test], that David Carmichael has a disability." *Opp'n to Mot. for Summ. J.* at 10 n.14 and 21 n.25.   In its reply, Verso does not argue that it is in fact questioning whether Mr. Carmichael was disabled.   The Court follows the lead of the parties and assumes, for purposes of this Motion for Summary Judgment, that Mr. Carmichael has a qualifying disability under the ADA.

light most favorable to the nonmovant and resolv[es] all reasonable inferences in that party's favor," *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002), the nonmoving party cannot meet its burden with "conclusory allegations, improbable inferences, and unsupported speculation." *Sutliffe v. Epping School Dist.*, 584 F.3d 314, 325 (1st Cir. 2009) (quoting *Sullivan v. City of Springfield*, 561 F.3d 7, 14 (1st Cir. 2009)).

### 1.   Evidentiary Issues

The parties raise three issues regarding what evidence can be considered for summary judgment.  First, Verso contends that "Plaintiff cannot create a material fact issue by submitting affidavit testimony which contradicts prior sworn statements."  *Reply to Opp'n to Summ. J.* at 1-2) (citing *Colantuani v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994)).  In *Colantuani*, the First Circuit upheld the district court's disregard of affidavit testimony, which would have created an issue of material fact, because it contradicted prior testimony given under oath.  The First Circuit stated, "When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony changed."  *Colantuani*, 44 F.3d at 4-5 (citing 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2726, at 30-31 (2d ed. Supp. 1994)).  The question is whether the responding party is attempting "to manufacture an issue of fact in order to survive summary judgment."  *Orta-Castro v. Merck, Sharp & Dohme Quimica P.R., Inc.*, 447 F.3d 105, 110 (1st Cir. 2006).  As the First Circuit reiterated in *Colburn v. Parker Hannifin/Nichols Portland Div.*, the "applicable standard in this circuit is *not* whether a sham issue of fact has been created," but whether "an interested witness has given clear answers to unambiguous questions" and whether he is attempting to "create a conflict and resist summary judgment with an affidavit that is

clearly contradictory without providing a satisfactory explanation of why the testimony is changed." 429 F.3d 325, 332 n.3 (1st Cir. 2005) (emphasis in original) (internal quotations and citations omitted).

Verso cites portions of Mr. Carmichael's worker's compensation testimony and deposition to argue that his current affidavit contradicts these prior under oath statements. *Reply to Opp'n to Summ. J.* at 1-2. The Court detects four separate sub-arguments: because Mr. Carmichael previously (1) admitted that work restrictions limited him to light duty work, (2) attempted to get back a light duty position, (3) did not look for other millwright/pipefitter jobs because he felt he was not qualified because of his restrictions, and (4) acknowledged that millwright/pipefitter contained several heavy duty tasks and that rotation among all of the duties was routine, Mr. Carmichael cannot now claim that he was performing and is able to perform the full duties of pipefitter/millwright. *Id.* The Court has carefully reviewed Mr. Carmichael's prior testimony and his affidavit and concludes that there is sufficient ambiguity in the testimonial questions and his responses when compared with the contents of the affidavit so that *Colantuani* does not apply. *See Gillen v. Fallon Ambulance Service, Inc.*, 283 F.3d 11, 26 (1st Cir. 2002) (overturning district court's disregard of an affidavit because "[a] subsequent affidavit that merely explains, or amplifies upon, opaque testimony given in a previous deposition is entitled to consideration in opposition to a motion for summary judgment").

Mr. Carmichael contends that Verso's millwright/pipefitter job descriptions, attached as exhibits to Mr. Carmichael's deposition, "are inadmissible hearsay and should not be considered." *Opp'n to Summ. J.* at 10. Rule 56(e) requires that supporting or opposing affidavits must be made on personal knowledge and set forth "facts that would be admissible in evidence." Fed. R. Evid. 56(e). Mr. Carmichael's objection is misplaced. Verso's job descriptions fall

11

within the business records hearsay exception to the rule against hearsay.  Fed. R. Evid. 803(6); *Carmichael Dep. Ex.* at 1, 8 (Docket # 32-1) (including such information as position title, employer, supervisor's name and location, and date).  Although Verso did not introduce the descriptions through affidavit or deposition testimony from a qualified custodian, other types of evidence may be used as well.  10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2738 (stating that affidavits may be used in conjunction with other types of evidence).  During his deposition, when Mr. Carmichael was shown the Verso job descriptions, he admitted "I've seen these," *Carmichael Dep.* at 83, and did not object to the statement that the document was "in fact, the job analysis for the millwright job."  *Id.* at 86.  The Court will consider the job descriptions in ruling on the pending dispositive motion.

Third, Mr. Carmichael seeks to use two Verso communications that Verso now claims were inadvertently produced during discovery and are privileged.  The two documents are emails between Verso management personnel relaying advice given to IP from its attorney.  *Def.'s Add'l Statement of Material Fact* at ¶¶ 147, 148 (Docket # 55) (*DASMF*).  Mr. Carmichael argues the communications are not privileged and even if they were, Verso waived objection by not taking reasonable steps to prevent the disclosure and by allowing the document to be used in two depositions.  *Pl.'s Rule 56(e) Resp. to Def.'s Obj. to Pl.'s Statement of Material Fact* (Docket # 57).  Verso contends that the communications "relate[] the advice of Verso counsel to Verso management and [are] protected by the attorney-client privilege."  *DASMF* at ¶¶ 147, 148. Since the inadvertently disclosed communications do not alter the Court's decision on the pending dispositive motion, the Court does not reach whether the attorney-client privilege applies to these inadvertently disclosed communications.  The Court has not considered the contested emails.

### 2.    Disability Discrimination

Mr. Carmichael alleges disability discrimination under both the ADA and the MHRA. Because "interpretation of the ADA and of the Maine Human Rights Act have proceeded hand in hand," the Court will address Mr. Carmichael's MHRA claim under the ADA rubric.  *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 14 (1st Cir. 1997) (quoting *Winston v. Maine Technical College Sys.*, 631 A.2d 70, 74 (Me. 1993)).  The Court discusses the two statutes separately only when they diverge.  The ADA prohibits employment discrimination against qualified persons with a disability.  42 U.S.C. § 12112(a).  Mr. Carmichael premises his claim of disability discrimination upon two discrete theories: (1) disparate treatment and (2) failure to reasonably accommodate.  Verso has moved for summary judgment on both.

### a.    Disparate Treatment

To evaluate Mr. Carmichael's disparate treatment claim, the Court uses "the burden-shifting framework outlined by the Supreme Court in *McDonnell-Douglas*."  *Tobin v. Liberty Mut. Ins. Co*., 433 F.3d 100, 104 (1st Cir. 2005) (citing *Higgins v. New Balance Athletic Shoe, Inc.,* 194 F.3d 252, 264 (1st Cir. 1999)).  Under this framework, Mr. Carmichael must first establish a prima facie case by establishing

> that (1) he suffers from a disability or handicap, as defined by the ADA…[;] that (2) he was nevertheless able to perform the essential functions of his job, either with or without reasonable accommodation[;] and that (3) [Verso] took an adverse employment action against him because of, in whole or in part, his protected disability.

*Id*. at 104-05 (citing *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  If Mr. Carmichael is able to do this, the burden shifts to Verso to "articulate a legitimate, non-discriminatory reason for its employment decision and to produce credible evidence to show that the reason advanced was the real reason."  *Id*. at 105 (citing *McDonnell-Douglas Corp.*, 411 U.S.

at 802).  Verso's burden "is one of production, not persuasion," *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000); the burden of proving unlawful discrimination rests with Mr. Carmichael at all times.  *Id.* at 143.  If Verso offers a legitimate, non-discriminatory reason for its employment decision, "the inference raised by the prima facie case dissolves," *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 823 (1st Cir. 1991), and the burden shifts back to Mr. Carmichael to "proffer evidence to establish that [Verso's] non-discriminatory justification is mere pretext, cloaking discriminatory animus."  *Tobin*, 433 F.3d at 105 (citing *McDonnell-Douglas Corp.*, 411 U.S. at 804).

### i.    Prima Facie Case

The first element—that Mr. Carmichael has a qualifying disability—is not contested; the Court turns to the second and third elements.

### ii.    Qualified Individual

Mr. Carmichael bears the burden of proving that he is a "qualified individual," which means "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).[13]  "The analysis is generally broken into two steps: (1) whether the employee could perform the essential functions of the job; and (2) if not, whether any reasonable accommodation by the employer would enable him to perform those functions."  *Ward v. Massachusetts Health Research Institute, Inc.*, 209 F.3d 29, 33 (1st Cir. 2000) (citing *White v.*

---

[13] The MHRA definition of "qualified individual" is similar to the ADA's definition. *Compare* 42 U.S.C. § 12111(8) ("an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires") *with* 5 M.R.S.A. § 4553(8-D) ("an individual with a physical or mental disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that the individual holds or desires").  However, unlike the ADA, the MHRA's definition of "physical or mental disability" does not require that a plaintiff pursuing a disability discrimination complaint prove the disability substantially limits a major life activity. *Whitney v. Wal-Mart Stores, Inc.,* 2006 ME 37, 895 A.2d 309. Because the parties agree that Mr. Carmichael suffers from a disability or handicap as defined by the ADA, he also meets the less stringent standards of the MHRA on this issue.

*York International Corp*., 45 F.3d 357, 361 (10th Cir. 1995)).  When the essential functions of

the job are contested, however, "it is difficult to separate the analysis in this manner."  *Ward*, 209

F.3d at 34.  As in *Ward*, the Court first discusses the essential functions of millwright/pipefitter

and then looks to whether there is "a reasonable accommodation that will allow [Mr.

Carmichael] to perform the essential functions of his job."  *Id.*; *see also Rooney v. Sprague*

*Energy Corp*. (*Rooney II*), 483 F. Supp. 2d 43, 50-57 (D. Me. 2007) (analyzing first whether the

employer established the essential job functions and then whether there was a reasonable

accommodation).

### iii.    Essential Functions

Although Mr. Carmichael has the burden of showing that he is capable of performing the

essential functions of millwright/pipefitter, Verso "bear[s] the burden of proving that a given job

function is an essential function."  *Ward,* 209 F.3d at 35 (defending the burden by arguing that

the employer "has better access to the relevant evidence" to prove essential job functions).

Under the ADA, an essential function of a job is a "fundamental job duty of the position at issue

... [and] does not include the marginal functions of the position."  *Mulloy v. Acushnet Co.,* 460

F.3d 141, 147 (1st Cir. 2006) (quoting *Kvorjak v. Maine,* 259 F.3d 48, 55 (1st Cir. 2001)).

Further, the ADA instructs that "consideration shall be given to the employer's judgment as to

what functions of a job are essential, and if an employer has prepared a written description

before advertising or interviewing applicants for the job, this description shall be considered

evidence of the essential functions of the job."  42 U.S.C. § 12111(8).  The inquiry, however,

does not end with the employer.  The Equal Employment Opportunity Commission's (EEOC)

regulations, the federal agency charged with enforcement of anti-employment discrimination

laws, provide seven additional factors relevant to whether a job duty is essential:

(i) The employer's judgment as to which functions are essential;
(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
(iii) The amount of time spent on the job performing the function;
(iv) The consequences of not requiring the incumbent to perform the function;
(v) The terms of a collective bargaining agreement;
(vi) The work experience of past incumbents in the job; and/or
(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3). Thus, although the First Circuit states that courts should "generally give substantial weight to the employer's view of job requirements," *Mulloy*, 460 F.3d at 147 (quoting *Ward*, 209 F.3d at 34), this view, "though important, is not dispositive." *Gillen*, 283 F.3d at 25. "The purpose of these provisions is not to enable courts to second-guess legitimate business judgments, but, rather, to ensure that an employer's asserted requirements are solidly anchored in the realities of the workplace, not constructed out of whole cloth." *Id*.

Mr. Carmichael has weight and frequency restrictions against lifting, twisting, climbing, grasping, and pulling, and Verso alleges that these strenuous activities make up the essential functions of both millwright and pipefitter. *Mot. for Summ. J.* at 10 (stating that the jobs include "frequent heavy lifting, frequent carrying, and frequent twisting"). Mr. Carmichael responds that Verso's job descriptions "overstate the physical activity and strength requirements for both jobs." *Opp'n to Summ. J.* at 12-13.

Under the EEOC framework, the first factor—the employer's judgment as to which functions are essential—favors Verso. Verso's job descriptions for both millwright and pipefitter, under the "Physical Activity and Strength Requirements" sections, reflect how lifting, carrying, pushing, pulling, climbing, and twisting are performed "frequently" and that lifting, pushing, and pulling is often done with heavy weight. *Carmichael Dep. Ex.* at 4, 5, 10, 11. The Court gives "substantial weight" to Verso's view of the job requirements. *Mulloy*, 460 F.3d at 147.

To the extent the second factor applies, there is no information on whether Verso used its millwright/pipefitter job description for hiring purposes. Verso has not alleged it did.

The third factor is the "amount of time spent on the job performing the function[s]." Mr. Carmichael states that the heavier aspects of the job descriptions "do not accurately describe the actual practices as to tasks performed by millwrights/pipefitters as of 2006," *Carmichael Aff*. at ¶ 12, and that the requirements vary depending on the specific assignment. *Carmichael Dep*. at 89, 90. His testimony is contradicted by Verso's job descriptions, which state that the physical requirement portions of the job descriptions reflect "job site interview, observation, and specific tests and measurements." *Carmichael Dep. Ex*. at 1, 8. In the context of a motion for summary judgment, this factor favors Mr. Carmichael because at this stage the Court is required to view the evidence in the light most favorable to him, not Verso.[14]

The fourth factor—the "consequences of not requiring the incumbent to perform the function[s]"—slightly favors Verso. Verso logically points out that if Mr. Carmichael is not required to perform the heavier duties of millwright/pipefitter position, Verso would be forced to re-assign those functions to other millwright/pipefitters. *Reply to Opp'n to Summ. J.* at 2. Verso's position is consistent with First Circuit law. *Feliciano v. R.I.*, 160 F.3d 780, 785 (1st Cir. 1998) (stating that "[t]he ADA does not require an employer to accommodate a disability by foregoing an essential function of the position or by reallocating essential functions to make other workers' jobs more onerous"). Mr. Carmichael, however, testified that assignments vary depending on a worker's restrictions, and he has raised the availability of assistive devices. *Carmichael Dep*. at 90.

---

[14] The job description for pipefitter was made in 1993 and, although the millwright job description is dated 2004, Mr. Carmichael claims that he had seen the same description with a 1993 date. *Carmichael Dep*. at 86. Taking Mr. Carmichael at his word, essential functions of both jobs could have changed in the 10 plus years. The job descriptions do not necessarily reflect the current use or availability of assistive devices.

The remaining factors include the terms of a collective bargaining agreement, the work experience of past incumbents in the job, and/or the current work experience of incumbents in similar jobs. There is little direct evidence as to these factors.

Summary judgment is rarely appropriate when there is a dispute about an essential function because the inquiry "involves fact-sensitive considerations and must be determined on a case-by-case basis." *Gillen*, 283 F.3d at 25. The case law in this circuit reflects this conclusion. *See*, *e.g.*, *Ward,* 209 F.3d at 35 (reversing summary judgment because "a reasonable factfinder could conclude that a regular and predictable schedule is not an essential function of [plaintiff's] position"); *Rooney II*, 483 F. Supp. 2d at 52-54 (finding that a factfinder could conclude that tank gauging or loading caustic soda were not essential functions of the Terminal Operation position); *Cruz v. McAllister Bros.*, 52 F.Supp.2d 269, 285 (D.P.R. 1999) (denying summary judgment because, *inter alia,* "there is a genuine issue as to the essential functions of an assistant port engineer" on the question of whether physical labor is an essential function of the job).

Although summary judgment on the essential function issue has been granted and affirmed, those cases are far more clear-cut than this case. *See*, *e.g.*, *Rios-Jimenez v. Principi*, 520 F.3d 31, 42 (1st Cir. 2008) (affirming grant of summary judgment, finding that attendance was an essential function of employee's supervisory job); *Mulloy*, 460 F.3d at 146 (affirming a grant of summary judgment, finding that an essential function of the employee's position—electrical engineer for a golf ball manufacturer—was to be physically present at the manufacturing plant); *Kvorjak*, 259 F.3d at 57-58 (affirming a grant of summary judgment, finding that an essential function of the employee's supervisory job was to be physically present).

18

Here, a reasonable fact finder could conclude that the heavier aspects of the millwright/pipefitter position no longer constitute essential functions, are so infrequently performed as to be described as "marginal functions," or are less physically demanding than Verso's written job descriptions suggest because of assistive devices.  Whether Verso's written job descriptions accurately represent current practices in the company and describe the essential functions of millwright/pipefitter is a factual, not a legal, determination.  Summary judgment is not appropriate on this issue.

### iv.    Reasonable Accommodation

Having concluded that there is "a genuine issue of material fact as to the essential functions of [Mr. Carmichael's] job, the inquiry could theoretically end there."  *Rooney II*, 483 F. Supp. 2d at 57.  In fact, to resolve many of the remaining issues it is necessary to know the essential functions of the millwright/pipefitter positions.  Nevertheless, even if there were no question about the essential functions, summary judgment is still unavailable to Verso.  Mr. Carmichael has presented sufficient evidence that Verso could have provided a reasonable accommodation to allow Mr. Carmichael to perform his job despite his disability.

An employer violates the ADA if it fails to "mak[e] reasonable accommodations ... of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."  42 U.S.C. § 12112(b)(5)(A); *see also Mulloy*, 460 F.3d at 148.

The term "reasonable accommodation," as defined in the Code of Federal Regulations, means: "Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a

19

qualified individual with a disability to perform the essential functions of that position."   29 C.F.R. § 1630.2(o) (ii).   The law requires an employer neither "to accommodate a disability by foregoing an essential function of the position or by reallocating essential functions to make other workers' jobs more onerous'" nor "to create a new job for an employee."   *Mulloy*, 460 F.3d at 153 (quoting *Kvorjak*, 259 F.3d at 57).

Mr. Carmichael states that Verso could have accommodated him either by allowing him to work under his current restrictions or by reassigning him to another position.   *Opp'n to Summ. J.* at 13-14.   Verso responds that Mr. Carmichael's restrictions are unreasonable because they prevent him from performing the essential functions of the millwright pipefitter job and are unspecific and unsafe.   *Reply to Opp'n to Summ. J.* at 3.   Verso also argues that Mr. Carmichael has not identified open job positions for which he was qualified.   *Mot. for Summ. J.* at 13-14.

### v.   Work Restrictions as a Reasonable Accommodation

Whether Mr. Carmichael's work restrictions prevented him from performing the essential functions of millwright/pipefitter, however, must await a factual determination as to the "essential functions" of the positions.   Further, whether assistive devices and task rotating would have enabled Mr. Carmichael to perform the heavier duty aspects of millwright/pipefitter position is a factual question.

### vi.   Safety to Mr. Carmichael

Verso next argues that the restrictions are unreasonable accommodations because Mr. Carmichael reinjured himself while working pursuant to them.   In *Feliciano*, the First Circuit upheld summary judgment against a disabled employee because the employee had not raised a material fact about the reasonableness of a proposed accommodation.   160 F.3d at 785.   The First Circuit found that the proposed accommodation was unreasonable in part because the disabled

plaintiff had reinjured herself while working despite the accommodation. *Id*. (stating that the plaintiff testified that when she "attempted to lift a patient with the assistance of a Hoyer lift and another [Institutional Attendant]: she reinjured her back and leg").[15]

The record confirms that Mr. Carmichael experienced increased pain during the summer of 2006 caused, at least in part, by his work at Verso. Mr. Carmichael admitted that resuming his position as millwright/pipefitter caused him additional pain "in the aggregate," *Carmichael Dep*. at 110, and Dr. Caldwell noted that "[Mr. Carmichael] was trying to do the best he could through the spring, but by the summer it was clear that the additional work he was doing was causing more of the thoracic pain." *Caldwell Dep*. at 15-16.[16]

Nevertheless, Mr. Carmichael's increased pain does not necessarily mean his proposed accommodations are unreasonable. In *Feliciano*, the employee acknowledged that she had sustained a new injury while lifting a patient with a Hoyer life. Here, there is little information as to whether Mr. Carmichael's increased pain constituted a new injury or otherwise presented a risk to him, his co-workers, or Verso. Not every ache in the workplace amounts to an injury and whether Mr. Carmichael was willing and able to work through his discomfort remains unclear on this record. Absent medical evidence to the contrary, the Court will not assume that Mr.

---

[15] Support for considering Mr. Carmichael's safety when determining the reasonableness of an accommodation is found in *EEOC v. Amego, Inc*, 110 F.3d 135 (1st Cir. 1997). In *Amego*, the First Circuit held that a disabled employee was not "qualified" for purposes of a prima facie ADA claim when the employee posed a threat to others:

> it is the plaintiff's burden to show that he or she can perform the essential functions of the job, and is therefore "qualified." Where those essential job functions necessarily implicate the safety of others, plaintiff must demonstrate that she can perform those functions in a way that does not endanger others.

*Id*. at 144. Other circuits have extended *Amego* to employees who pose a threat to themselves. *See Koshinski v. Decatur Foundry, Inc.*, 177 F.3d 599, 603 (7th Cir. 1999); *Kalskett v. Larson Mfg. Co. of Iowa, Inc*., 146 F. Supp. 2d 961, 985 (N.D. Iowa 2001).

[16] In his affidavit, Mr. Carmichael stated that "in addition to my millwright/pipefitter job, I was engaging in a lot of physical activity at home, including vehicle, home and property maintenance, mowing fields and stacking wood. As a result, I experienced increased pain." *Carmichael Aff*. at ¶ 20. To the extent the affidavit attempts to attribute all his increased pain to non-work-related activity, Mr. Carmichael's affidavit is flatly contradicted by extensive medical records and his own prior testimony. On this point, *Colantuani* applies. *Colantuani*, 44 F.3d at 4-5. The Court will instead interpret Mr. Carmichael's affidavit to say that in addition to the increased pain he experienced at work, he also experienced increased pain at home.

Carmichael's increased symptoms in the summer of 2006 made the proposed accommodations unreasonable.

Second, without knowing the essential functions of millwright/pipefitter position, it is unclear whether the performance of essential functions caused the additional pain. Although Mr. Carmichael conceded that he was working under restrictions during the summer of 2006, the record does not establish whether he was allowed to work fully within the restrictions, or whether he had access to assistive devices to mitigate their impact. For example, in answer to the question "you knew that if you became too restricted you might not have a job," Mr. Carmichael answered that "I was in the belief that the company was being very hostile towards injured workers at the time and I didn't want any restrictions unless they were necessary." *Carmichael Dep.* at 111. A reasonable factfinder could conclude that, in an attempt to save his job, Mr. Carmichael ignored his tolerance levels and his work restrictions, resulting in pain but not justifying his termination.

### vii.    Hardship to Verso

Finally, an accommodation is not reasonable if it "imposes an undue hardship" on the employer. *Ward,* 209 F.3d at 36 (citing *Stone v. City of Mt. Vernon,* 118 F.3d 92, 97 (2d Cir. 1997)). "Under the ADA, employers are required to provide reasonable accommodation to an otherwise qualified applicant or employee with a disability, unless the employer can demonstrate that the accommodation would impose an undue hardship on the employer's business." *Tobin,* 433 F.3d at 106. The ADA defines "undue hardship" as "an action requiring significant difficulty or expense." 42 U.S.C. § 12111(10)(B).[17] To satisfy its burden, the employer "must

---

[17] The statute lists several relevant factors, including "the nature and cost of the accommodation;" "the overall financial resources of the [employer] ...; the overall size of the business of the [employer] with respect to the number of its employees; [and] the number, type, and location of its facilities." 42 U.S.C. § 12111(10)(B); *see also* 29 C.F.R. § 1630.2(p). The record sheds no light on any of these factors.

submit some evidence in support of its position that the requested accommodation would impose undue hardship." *Ward,* 209 F.3d at 36.

Verso contends that Mr. Carmichael's "pacing" restrictions were a hardship to Verso because "Plaintiff was to stop any activity that caused him pain or discomfort, limiting Plaintiff's work capacity at any given moment according to his own subjective tolerance[,]….[the restriction] does not allow an employer to assess on a daily or hourly basis what work activities Plaintiff could perform safely." *Reply to Opp'n to Summ. J.* at 3. Verso concludes that allowing Mr. Carmichael to work up until his subjective tolerance "necessarily means excusing Plaintiff from those described tasks and requiring others to perform them when Plaintiff's subjective tolerance limits are reached." *Mot. for Summ. J.* at 13. Verso fails, however, to provide any evidence of specific hardship; it cites to no statement of material fact and the conclusion is not corroborated with affidavit testimony.

Although subjective restrictions are inherently problematic, they are not per se unreasonable.[18] Subjective restrictions can be unreasonable when the essential functions of a job preclude such an accommodation. *See, e.g.*, *Castellani v. Bucks County Municipality*, No. 07-1198, 2008 WL 3984064, at *8 (E.D. Pa. August 27, 2008) (finding that allowing a 911 dispatcher to leave her station "at will" was unreasonable because her presence at her station was critical to job position); *Huber v. Howard County, Md.*, 849 F. Supp. 407, 414 (D. Md. 1994) (finding that a subjective tolerance restriction was not appropriate for a firefighter because the County would be forced to hire extra firefighters to account for emergencies in which the

---

[18] Verso's appeal to *Derbis* and *Beck* are inapposite because the issue was employees' failure to cooperate, not employees' subjective restrictions. In *Derbis v. U.S. Shoe Corp*., the plaintiff maintained no accommodation was necessary, even though her own Doctor disagreed. 67 F.3d 294 (4th Cir. 1995). In *Beck v. Univ. of Wis. Bd. of Regents*, the plaintiff failed to give the employer any indication of what specific accommodations were necessary. 75 F.3d 1130 (7th Cir. 1995). Here, the record reflects that Mr. Carmichael cooperated with Verso, attending meetings and submitting extensive paperwork on his restriction.

plaintiff firefighter could not perform).  Verso has not explained, nor offered any evidence to prove, why the millwright/pipefitter position precluded a subjective tolerance accommodation. For example, Verso does not claim, and its written job requirements do not include, any suggestion that millwright/pipefitters must complete individual tasks within certain time limits. *See, e.g.*, *Carmichael Dep. Ex.* at 1-13.  Admittedly, that millwright/pipefitters work in teams complicates the issue; nevertheless, a reasonable fact finder could still conclude that Mr. Carmichael could have been afforded more time to complete the more strenuous tasks, thereby accounting for breaks to accommodate the pacing restrictions.  Because whether a "pacing" restriction would have caused a hardship to Verso is a factual question, Mr. Carmichael establishes this element of his prima facie case.[19]

### viii.    Adverse Employment Action

Verso next argues that Mr. Carmichael "cannot establish that Verso took action against him on the basis of any alleged disability." *Mot. for Summ. J.* at 17.  Verso argues that (1) the decision to delay Plaintiff's return to work was based on Dr. Curtis's opinion that further clarification of restrictions was necessary; (2) Plaintiff was kept on a leave of absence to obtain more information about his work restrictions; and (3) Mr. Carmichael was terminated because he had exhausted available leave under the CBA.  *Id.*

An "adverse employment action" is broadly defined to include any material "disadvantage[ ] in respect to salary, grade, or other objective terms and conditions of employment." *Sensing v. Outback Steakhouse of Florida, LLC*, 575 F.3d 145, 157 (1st Cir. 2009) (overturning summary judgment because district judge had found no adverse action when employee was not *terminated* because of her disability) (quoting *MacCormack v. Boston Edison*

---

[19] Because the Court finds there is a factual question regarding whether Mr. Carmichael's work restrictions were a reasonable accommodation, the Court does not address whether Verso also failed to provide a reasonable accommodation when it did not reassign Mr. Carmichael.

*Co.*, 423 Mass. 652, 672 (1996)).[20]  Mr. Carmichael can establish an adverse employment action without having to prove that he was terminated because of his disability.

The record confirms that Mr. Carmichael suffered adverse work consequences because of his disability, the most obvious being that the protracted disability leave contributed to his termination since it exhausted his available leave.  *See Sensing*, 575 F.3d at 158 (finding plaintiff had sufficiently alleged discharge when she alleged that removing her from the work schedule and rejecting multiple requests to return to work "effectively ended her employment").[21]  The record establishes that Verso placed and kept Mr. Carmichael on long term disability leave because of his disability, *Mot. for Summ. J.* at 17, and Verso has not alleged any other justification for keeping Mr. Carmichael out of work.  *Cf. Rose v. Laskey*, 110 Fed. Appx. 136 (1st Cir. 2004) (stating "there is no genuine dispute about the fact that plaintiff was discharged because of his unacceptable behavior rather than because of any mental impairment").  Having established sufficient evidence as to each element, the Court concludes that Mr. Carmichael has stated a prima facie claim of disparate treatment.

### ix.    Non-Discriminatory Reason

Moving to the second step of the *McDonnell-Douglas* burden-shifting framework, Verso must "offer a non-discriminatory reason for the employment action in question."  *Che v. Mass. Bay Transp. Authority,* 342 F.3d 31, 39 (1st Cir. 2003) (citing *Bishop v. Bell Atl. Corp.* (*Bishop I*), 299 F.3d 53, 58 (1st Cir. 2002)).  Verso has.  Verso asserts a legitimate interest in on-the-job safety that required Mr. Carmichael to provide details about his disability and what

---

[20] Although the First Circuit was interpreting an "adverse employment action" in the context of a state disability claim, not the ADA, the state law at issue paralleled the federal standard.  *Sensing*, 575 F.3d at 153-54 (stating that "federal case law construing the ADA should be followed in interpreting the Massachusetts disability law").

[21] Verso's appeal to *Corujo-Marti v. Triple-S, Inc.*, 519 F. Supp. 2d 201 (D.P.R. 2007) is inapposite.  In *Corujo-Marti*, the court first found that the employee had not alleged a disability to meet her prima facie burden.  The court, assuming for argument that the prima facie case had been met, then found under the *McDonnell-Douglas* burden shifting test that the employer had stated a nondiscriminatory reason for its employment action and the employee had not shown that the reason was pretextual.

accommodations were necessary to allow him to safely perform his job. *See Sensing*, 575 F.3d at 162 (finding that the second prong of the *McDonnell-Douglas* test was met by a legitimate interest in having plaintiff submit to a medical exam before returning to work). Although based on Mr. Carmichael's disability, Verso's explanation is not discriminatory.

### x.  Inference of Discrimination

Under the third and final *McDonnell-Douglas* step, Mr. Carmichael must "present evidence to rebut defendant's explanation and 'show that the adverse employment action was [actually] the result of discriminatory animus.'" *Sensing*, 575 F.3d at 162 (quoting *Che,* 342 F.3d at 39). "Evidence that the employer's stated reasons are pretextual can be sufficient for a jury to infer discriminatory animus." *Id.* Such animus need not be the exclusive reason for the action; for summary judgment, it is sufficient if Mr. Carmichael establishes that the adverse action was imbued "in part with discriminatory animus." *Acevedo v. Johnson & Johnson*, 73 Fed. Appx. 472, 473 (1st Cir. 2003). Mr. Carmichael has done so.

A reasonable jury could find that Verso's placing and keeping Mr. Carmichael on long term disability was predicated, at least in part, on impermissible discrimination, rather than a permissible legitimate concern about his ability to perform the job safely. For example, the jury could find that Verso was unjustified in maintaining that Mr. Carmichael's "pace" restriction was too unspecific. Over the course of the year, Mr. Carmichael met multiple times with Verso management to discuss his restrictions and several times with his doctors to update their evaluations; his doctors provided detailed information about his restrictions in response to multiple Verso requests. The jury could conclude that had Verso legitimately questioned Mr. Carmichael's restrictions, they could have scheduled a joint meeting between Mr. Carmichael and his doctors or urged Dr. Curtis to perform his own evaluation. In addition, a reasonable jury

26

could find that Verso's fear of Mr. Carmichael reinjuring himself stemmed from an impermissible speculation "that a disability may indicate a greater risk of future injury…or may cause future worker's compensation or insurance costs." *See* EEOC Manual at § 6.4; *Sensing*, 575 F.3d at 163 (finding employer's concern that employee might reinjure herself could be considered by a jury to be "impermissible speculation as to risk of future injury rather than a legitimate concern about [employee's] present ability to safely perform the essential functions of her job"). For example, Dr. Curtis admitted that part of his hesitancy in approving Mr. Carmichael for work was a concern about his own liability should Mr. Carmichael reinjure himself. *DSMF* ¶ 30.

Because Verso's actions could have been motivated either by legitimate safety concerns or by impermissible discriminatory animus, Mr. Carmichael's disparate treatment claim survives summary judgment.

### b.   Failure to Accommodate

Mr. Carmichael also alleges that Verso violated the ADA and the MHRA when it failed to provide him with a reasonable accommodation. *Opp'n to Summ. J.* at 21. To survive a motion for summary judgment on this claim, Mr. Carmichael must establish that: (1) he suffered from a "disability" within the meaning of the statute; (2) he was a qualified individual in that he was able to perform the essential functions of his job, either with or without a reasonable accommodation; and (3) despite its knowledge of his disability, Verso did not offer a reasonable accommodation. *See Tobin*, 433 F.3d at 107.[22] The *McDonnell-Douglas* model does not apply because intentional discrimination is not required to prove a failure to accommodate. *Higgins*,

---

[22] Two other elements, sometimes noted, do not require additional discussion. *Calero-Cerez v. U.S. Dept. of Justice*, 355 F.3d 6, 20 n.3 (1st Cir. 2004). Verso is covered by the Rehabilitation Act, and Verso's failure to accommodate affected the terms and conditions of Mr. Carmichael's employment.

194 F.3d at 264 (stating that "[i]t follows inexorably that the *McDonnell Douglas* scheme is inapposite in respect to such claims"). As discussed above, Mr. Carmichael satisfies the first and second elements. *See Carroll*, 294 F.3d at 237 (stating that a reasonable accommodation claim consisted of the first two elements of a disparate treatment claim plus a distinct third element).

Turning to the third element, in determining whether an employer has failed to provide a reasonable accommodation, the First Circuit follows the two-step analysis outlined in *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254 (1st Cir. 2001). *Enica v. Principi*, 544 F.3d 328, 338 (1st Cir. 2008). First, Mr. Carmichael must show "not only that the proposed accommodation would enable [him] to perform the essential functions of [his] job, but also that, at least on the face of things, it is feasible for the employer under the circumstances." *Reed,* 244 F.3d at 259. Second, Mr. Carmichael must prove "that the request was sufficiently direct and specific so as to put the employer on notice of the need for an accommodation." *Id.* at 261. Verso then "may attempt to prove that, in fact, the proposed accommodation was not feasible and would constitute an 'undue' hardship." *Calero-Cerezo*, 355 F.3d at 23 (1st Cir. 2004) (citing *Reed,* 244 F.3d at 261).

Mr. Carmichael has satisfied both elements of the *Reed* test. First, without knowing the "essential functions" of millwright/pipefitter, Mr. Carmichael arguably could have performed the essential functions of the position with his proposed restrictions. In addition, as mentioned above, a "pacing" accommodation is at least facially feasible. Second, Mr. Carmichael consistently asked to be allowed to work within restrictions. For example, in a November 3, 2006 meeting with Verso management, Mr. Carmichael produced two M-1 forms to prove that he could not work without restrictions, *PSMF* at ¶ 127, and in a January 8, 2007 meeting with Verso management Mr. Carmichael specifically complained that the company was not accommodating his disability. *PSMF* at ¶ 164. Finally, as mentioned above, Verso argues that

pacing restrictions are an "undue" hardship but has produced no evidence to support its argument.  Mr. Carmichael has established a failure to accommodate claim.[23]

### 3.      The MHRA Safety Defense

Finally, in a footnote, Verso raises an MHRA safety defense, arguing once again that returning Mr. Carmichael to work under his proposed "pace" restriction "would have presented a 'direct threat' to [Mr. Carmichael's] health and safety." *Mot. for Summ. J.* at 16 n.19.[24]  Mr. Carmichael responds that Verso waived the defense by not pleading it affirmatively and, in the alternative, that Verso's fear is mere "speculation" and thus insufficient to qualify as a direct threat.

"The Maine safety defense permits handicap-based employment discrimination in individual cases when the employee's handicap renders him 'unable to perform his duties or perform those duties in a manner which would not endanger the health or safety of the employee

---

[23] Summary judgment is also unavailable because of evidence that Verso failed to engage in an interactive process once Mr. Carmichael requested an accommodation.  The ADA states that "it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual."  29 C.F.R. § 1630.2(o)(3).  Thus, the First Circuit recognizes that "[i]n some cases, a request for a reasonable accommodation may trigger a responsibility on the part of the employer to enter into an interactive process with the employee to determine an appropriate accommodation."  *Calero-Cerezo,* 355 F.3d at 23 (citing *Reed,* 244 F.3d at 262 n.11)).  Although the scope of the employer's obligation in this process is not crystal clear, "[t]he employer has at least some responsibility in determining the necessary accommodation," since "the regulations envision an interactive process that requires participation by both parties." 29 C.F.R. § 1630.2(o)(3); *Tobin,* 433 F.3d at 109 (recognizing that the standard governing the interactive process is less than clear).  Where a breakdown in the process has been identified, "courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary."  *Enica,* 544 F.3d at 339 (quoting *Beck,* 75 F.3d at 1135).  For instance, "[a] party that obstructs or delays the interactive process is not acting in good faith."  *Id.*

   Here, Mr. Carmichael's request for an accommodation in the November 3, 2006 meeting with Verso management triggered an obligation on the part of Verso to communicate with Mr. Carmichael about fashioning an accommodation. *Taylor v. Principal Fin. Group, Inc.,* 93 F.3d 155, 165 (5th Cir. 1996) (finding that an employee's initial request for accommodation triggers the employer's obligation to participate in the interactive process of determining an accommodation).  Reasonable factfinders could find that the multiple meetings between Verso and Mr. Carmichael fulfill Verso's interactive process obligations, but they could also conclude that Verso was merely going through the motions.  For example, Verso's repeated insistence on additional clarity, despite a year of conversations with Mr. Carmichael and multiple clarifications from his doctors, could reflect a decision by Verso to stonewall and put-off Mr. Carmichael until his disability leave expired.

[24] Verso does not argue that it pled an affirmative ADA direct threat defense and treats the defense as waived. However, the Court has considered safety when assessing whether Mr. Carmichael was a "qualified individual" under the ADA.

or the health or safety of others.'" *Maine Human Rights Comm'n v. Canadian Pac., Ltd.*, 458 A.2d 1225, 1233 (Me. 1983) (quoting 5 M.R.S.A. § 4573(4)).  The defense "requires individual assessments of the relationship between an employee's handicap and the specific legitimate requirements of his job." *Id.* at 1234.  Unlike the ADA direct threat defense, the burden for the Maine safety defense is squarely upon the employer to establish that, "to a reasonable probability, the employee's physical handicap renders him unable to perform his duties or to perform such duties in a manner which will not endanger his own health or safety or the health or safety of others." *Id.*

Verso has preserved a MHRA safety defense by raising a 5 M.R.S.A. § 4573-A(1) defense in its answer.  Section 4573-A(1) describes several defenses to a charge of discrimination, one being a "qualification standard" that is "job-related and consisted with business necessity, and such performance cannot be accomplished by reasonable accommodation."  Section 4573-A(1-A) clarifies that a "qualification standard" may include "a requirement that an individual does not pose a direct threat to…health or safety."  Although not specifically mentioning § 4573-A(1-A), Verso has preserved the defense by pleading the general provision.

The Court previously concluded that there is an issue of material fact as to whether Mr. Carmichael can safely perform the essential functions of millwright/pipefitter under certain restrictions.  Verso argues that his re-injury during the summer of 2006 proves he cannot.  *PSMF* at ¶¶ 17-19.  Dr. Caldwell states that Mr. Carmichael can, *Caldwell Dep.* at 109, and contests whether Mr. Carmichael was actually reinjured in the summer of 2006.  *Id.* at 15, 18-19.  Given this dispute, Verso is not entitled to summary judgment.

### 4.   Retaliation

Mr. Carmichael also alleges that Verso retaliated against him by not returning him to work in violation of the MWPA and the MHRA.  Mr. Carmichael alleges retaliation for (1) "complain[ing] to Verso on November 3, 2006 that Verso could not use the worker's compensation decree in his case against IP to require him to work without restrictions"; (2) "complain[ing] to Verso that it was not accommodating his disabilities on January 8, 2007"; and (3) filing a complaint with the Maine Human Rights Commission on March 6, 2007 "complaining, inter alia, of disability discrimination and worker's compensation retaliation." *Opp'n to Summ. J.* at 29.  Verso contends that Mr. Carmichael waived these retaliation issues by failing to raise them in his Complaint and that both the MPWA and the MHRA claims are preempted by federal law.  *Reply to Opp'n to Summ. J.* at 5-7.

### a.    New Basis for Retaliation

Verso argues that Mr. Carmichael cannot now introduce new bases for retaliation: because Mr. Carmichael previously limited his claim to retaliation for "complaints to OSHA, his objection to the transfer of medical records, his union grievances, and his 'disabilities,'" *Reply to Opp'n to Summ. J.* at 6 n.13 (summarizing Mr. Carmichael's deposition responses), any re-characterization of his claim that is different "is waived." *Id.* at 6.[25]  The word "disabilities," however, is broad enough to include retaliation for disability complaints.  Verso did not seek clarification during the deposition and Mr. Carmichael can now specify what he meant.[26]

### b.    Preemption

---

[25] Mr. Carmichael's MHRC charge also does not conflict with the current iteration of his retaliation claim; Mr. Carmichael alleges retaliation for filing the charge, regardless of the charge's content.

[26] Verso is correct that Mr. Carmichael did not report either a November 3, 2006 complaint or a January 8, 2007 complaint in his response to an interrogatory asking for him to identify every instance in which he had "reported conduct which he reasonably believed to be in violation of law." *Carmichael Interrog.* at 3-4 (Docket # 25-8).  Mr. Carmichael's omission is better addressed as a discovery violation than as a basis for summary judgment.

Verso contends that section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), preempts Mr. Carmichael's retaliation claims.  Section 301(a) provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter ... may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

Section 301 only precludes state-law claims when "resolution of a plaintiff's claim is substantially dependent on analysis of a CBA's terms."  *Lydon v. Boston Sand & Gravel Co*., 175 F.3d 6, 10 (1st Cir. 1999) (citations omitted).  The mere consultation of a CBA in the course of litigating a state-law claim is not sufficient to extinguish the state-law claim.  *See Livadas v. Bradshaw*, 512 U.S. 107, 124 (1994).  Instead, "[c]ourts confronted with state law claims must therefore locate the line between the need for mere consultation of a CBA, which does not demand federal preemption, and more active interpretation of that agreement, which does preempt the state law claims."  *Lydon*, 175 F.3d at 10.

### i.    MWPA

Verso argues that Mr. Carmichael's MWPA claim is preempted by the CBA.  *Mot. for Summ. J.* at 19.  The Court agrees.  In *Bishop v. Bell Atlantic Corp*. (*Bishop II*), this Court found that an employee's MWPA claim was preempted by section 301 because of the MWPA provision that the act "shall not be construed to diminish or impair" the rights of those operating under a CBA.  81 F. Supp. 2d 84, 88 (D. Me. 1999) (citing 26 M.R.S.A § 837).  Because the provision specifically requires the Court to interpret the CBA to determine whether the MWPA would diminish or impair rights under the CBA, Mr. Carmichael's MWPA claim is preempted.

Mr. Carmichael contends that *Bishop II* is distinguishable on its facts: "because Bishop was asserting a loss of overtime hours and excessive discipline," judicial review of the CBA was

necessary, whereas no review of the CBA is necessary for resolution of Mr. Carmichael's claims. *Opp'n to Summ. J.* at 27 n.31.[27]   Mr. Carmichael reads *Bishop II* too narrowly.  In *Bishop II*, this Court held that any MWPA claim made by an employee working under a CBA is almost by definition intertwined with an interpretation of the CBA and therefore preempted.  *Bishop II*, 81 F. Supp. 2d at 88-89 (basing its finding of preemption on the language of the MWPA *not* the facts of the case); *Reynolds v. TCM Sweeping, Inc.*, 340 F. Supp. 2d 541, 547 n.10 (D.N.J. 2004) (interpreting *Bishop II* to have turned on statutory language, rather than the facts of the case).  Furthermore, as in *Bishop II*, the Court would in fact have to look to multiple provisions of the CBA, such as the provisions regarding Verso's right to demand additional medical information and its ability to place and keep Mr. Carmichael on disability leave, "in order to conclude that the Whistleblowers' Act does or does not impair or diminish the rights of those operating under the Agreement."  *Bishop II*, 81 F. Supp. 2d at 88 n.4.  As in *Bishop II*, "[e]ven if [Mr. Carmichael's] claim under the Whistleblower's Act could ultimately be stated and proven without reference to the CBA, the Court would first have to interpret the CBA to determine whether or not the Act would diminish or impair the rights of employees or management under the CBA."  *Id.* at 89.  Because it is this interpretation that the First Circuit has prohibited, Mr. Carmichael's MWPA claim is preempted.

### ii.   MHRA

---

[27] Regarding the MWPA claim, Mr. Carmichael's argument is circular.  *Bishop II* ruled that a MWPA claim is federally preempted by the LMRA, because in § 837, the MWPA provides that it "shall not be construed to diminish or impair the rights of a person under any collective bargaining agreement."  *Bishop II*, 81 F. Supp. 2d at 88.  This means that a stand-alone MWPA claim under § 301 is preempted because it necessarily requires the court to interpret the CBA.  Noting that a MHRA claim under § 4572(1)(E) is not similarly preempted, Mr. Carmichael contends that because § 4572(1)(A) makes a violation of the MWPA a violation of the MHRA, a claim under § 4572(1)(A) is similarly not preempted.  Mr. Carmichael's argument, however, ignores the plain fact that to make a determination under the MWPA, a court must interpret the CBA when applying § 837.  Section 4572(1)(A) incorporates § 837 as well as other provisions of the MWPA and preemption applies, regardless of whether the MWPA claim is a stand-alone claim or a claim filed under the incorporation provision of the MHRA.

Mr. Carmichael alleges an MHRA violation under both 5 M.R.S.A. § 4572(1)(A) and § 4572(1)(E).  *Opp'n to Summ. J.* at 27.[28]  Because the MHRA contains no provision similar to section 837 of the MWPA, MHRA claims by employees working under a CBA are generally not preempted.  *Bishop II*, 81 F. Supp. 2d at 89 (holding that because the wording in section 837 of the MWPA was critical to its preemption, the lack of similar wording in the MHRA means no preemption).

As an initial matter, Verso contends that Mr. Carmichael waived a standalone MHRA retaliation claim by not including it in his Complaint.  The Court disagrees.  In his Complaint, Mr. Carmichael alleged retaliation "in violation of the Maine Whistleblowers' Protection Act, 26 M.R.S.A. § 833 and, by incorporation, the Maine Human Rights Act, 5 M.R.S.A. § 4551 *et. seq.*"  *Compl.* at 3.  The phrase "by incorporation" highlights the close connection between MWPA and MHRA claims:  "The MWPA prohibits discrimination against employees because of whistleblowing activities, but the MHRA provides the individual cause of action for an MWPA violation."  *Tripp v. Cole*, 425 F.3d 5, 8 n.2 (1st Cir. 2005).  Although Mr. Carmichael's oblique reference by incorporation to his MHRA claim is not a model of clarity, Verso had the right through discovery to determine more precisely what Mr. Carmichael was claiming, and from the Court's perspective, the reference by incorporation to the MHRA was sufficient to place Verso on notice of a potential MHRA claim.

Verso next argues that because "MWPA violations form the basis of [the] 'protected' conduct" of Mr. Carmichael's MHRA claim, the Court must analyze section 837 of the MWPA in deciding the MHRA claim.  *Reply to Opp'n to Summ. J.* at 6.  However, Mr. Carmichael's

---

[28] Section 4572(1)(A), in relevant parts, makes it unlawful for an employer to take an adverse employment action against a disabled employee "because of the [disabled person's] previous assertion of a claim or right under [the worker's compensation act] or because of previous actions taken by the applicant that are protected under the MWPA."  Section 4572(1)(E) makes it unlawful for an employer to discriminate against a disabled person "because they have opposed a practice that would be a violation of this Act."

MHRA retaliation claim is not limited to a claim under § 4572(1)(A) for engaging in protected activity as defined by the MWPA; he also asserts a claim under § 4572(1)(E) for retaliation after bringing a MHRC charge.  *Opp'n to Summ. J.* at 27.[29]  Because a § 4572(1)(E) claim does not require interpreting whether the conduct was protected under the MWPA, the section 837 language is not implicated.  *Bishop II*, 81 F. Supp. 2d at 89 (finding that a § 4572(1)(E) is not preempted).  Instead, as in *Bishop II*, Mr. Carmichael can attempt to satisfy the elements of his § 4572(1)(E) claim without referencing the CBA.  *Id.* (finding MHRA claim not preempted because section 837 language not implicated and state-law retaliatory discharge claims turns on a factual inquiry which do not require interpretation of the CBA); *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 407 (1988) (finding that state-law retaliatory discharge claim turned on a factual injury that did not implicate the CBA); *Martin v. Shaw's Supermarket's, Inc*., 105 F.3d 40, 43 (1st Cir. 1997) (finding it "very doubtful" that preemption of retaliation claims could take place absent a provision requiring courts to interpret CBAs).

### iii.    General Preemption

Verso makes a final plea that "all of Plaintiff's state law claims are preempted."  *Mot. for Summ. J.* at 27.  The Court finds this catch-all preemption argument similarly unavailing.

Verso's argument revolves around various statements by Mr. Carmichael that Verso discriminated by refusing "Mr. Carmichael's requests to allow him to return to work."  *Id*. at 28. Verso contends that Mr. Carmichael's word choice proves that both his retaliation and disability discrimination claims revolve around his rights under the CBA and thus their resolution "hinges upon the interpretation of the CBA."  *Id*. at 27 (citing *Fant v. New England Power Service Co*.,

---

[29] Mr. Carmichael's also asserts a § 4572(1)(A) claim for action taken against him for asserting a right related to worker's compensation.  *Opp'n to Mot. for Summ. J.* at 27.  Because the Court finds a § 4572(1)(E) allegation, the Court need not address whether a § 4572(1)(A) claim not based on the MWPA is preempted.  *Bishop II*, 81 F. Supp. 2d at 89 n.5 (leaving unanswered whether a claim under section 4572(1)(A) "is subject to federal preemption under section 301 of the LMRA").

239 F.3d 8, 14 (1st Cir. 2001).  Mr. Carmichael makes a much broader argument, however, contending that the violation of the restricted duty policy, and Verso's refusal to return him to work, supports an inference of discriminatory intent in violation of both anti-discrimination and anti-retaliation state laws.  *See*, *e.g.*, *Opp'n to Summ. J.* at 19.

Although the First Circuit held in *O'Brien v. Consolidated Railroad Corp*. that a state law claim that necessitated turning to the CBA to determine the essential functions of a position counted as an "interpretation" that preempted state law, 972 F.2d 1, 4-5 (1st Cir. 1992), the case has been limited by later case law.  Subsequently, the United States Supreme Court decided *Livadas v. Bradshaw*, which clarified that a referral to a CBA to determine the pay scale or to calculate damages does not result in preemption.  512 U.S. 107, 124 (1994).  *See LaRosa v. United Parcel Service, Inc*., 23 F. Supp. 2d 136, 146-47 (D. Mass. 1998) (stating that although not overruled, *Livadas* had called *O'Brien*'s reasoning into question).  The current line seems to be between interpreting a CBA and referencing one.  *See Fant*, 239 F.3d at 15 (stating that "questions relating to qualifications and seniority usually require recourse to details that are imbedded in CBAs").

Cognizant of the admonition to avoid interpretations of the details of a CBA, the Court is also aware that Mr. Carmichael has not waived his rights under the MHRA by working pursuant to a CBA.  *Allis-Chalmbers Corp. v. Lueck*, 471 U.S. 202, 212-13 (1985) (stating that "§ 301 does not grant the parties to a collective-bargaining agreement the ability to contract for what is illegal under state law" or preempt state-law rights that exist independently of private agreements).  The Court is loath to summarily dispose of Mr. Carmichael's state discrimination claims simply because Mr. Carmichael is the member of a union and his working conditions are subject to a CBA.  Though *O'Brien* cautions against judicial interpretations of CBA provisions,

the Court is not convinced that the need to reference Verso's CBA to determine certain factual issues, such as whether open positions were available for reassignment or whether Verso complied with its obligations to employees with work restrictions under the CBA, requires preemption of all Mr. Carmichael's state claims.

### c.      Summary Judgment on the Retaliation Claim

The *McDonnell-Douglas* burden-shifting framework applies where, as here, there is no direct evidence of retaliation. *Bishop I*, 299 F.3d at 58 (citing *Fennell v. First Step Designs, Ltd.*, 83 F.3d 526, 535 (1st Cir. 1996)). To establish a prima facie case of retaliation under the MHRA, Mr. Carmichael must show that: (1) he engaged in protected conduct under the statute; (2) he suffered an adverse employment action; and (3) a causal connection existed between the protected conduct and the adverse action. *Id.* (citing *Higgins*, 194 F.3d at 262). As in the disability context, if Mr. Carmichael makes his prima facie showing, the burden shifts to Verso to articulate legitimate, non-retaliatory reasons for its employment action. If Verso does so, the plaintiff must then show that the legitimate reason is pretextual and "the adverse employment action resulted from the defendant's retaliatory animus." *Id.* (citing *Fennell*, 83 F.3d at 535).

### i.      Prima Facie Claim

Mr. Carmichael has established a prima facie case of retaliation under § 4572(1)(E). The first element, engaging in protected conduct, is satisfied by filing a MHRC claim. Mr. Carmichael proves the second element, suffering an adverse employment action, because his continued placement on disability leave eventually led to his termination. Finally, Mr. Carmichael has produced sufficient evidence of a causal connection to prove the last element of his prima facie case. Mr. Carmichael filed his MHRC complaint on March 6, 2007 and on a return to work meeting on March 26, 2007 Verso once again demanded more specific

information detailing his restrictions.  A reasonable jury could infer from the less than three weeks that passed since the MHRC complaint that Verso's decision to continue to keep Mr. Carmichael on disability leave was made in retaliation for the claim.  *DeCaire v. Mukasey*, 530 F.3d 1, 19 (1st Cir. 2008) (stating that "our law is that temporal proximity alone can suffice to meet the relatively light burden of establishing a prima facie case of retaliation") (internal quotations omitted) (citing *Mariani-Colon v. Dep't of Homeland Sec. ex. rel. Chertoff*, 511 F.3d 216, 224 (1st Cir. 2007) (finding that temporal proximity of two months was sufficient to meet prima facie burden)); *Rhoades v. Camden Nat'l Corp.*, 575 F. Supp. 2d 260, 262-63 (D. Me. 2008) (finding temporal proximity of one month "particularly compelling" in meeting plaintiff's prima facie burden).

### ii.      Legitimate Reason

As mentioned in the disability context, Verso has proffered a non-discriminatory reason: Mr. Carmichael was kept on disability leave after his MHRC complaint because Verso still needed additional clarification on his restrictions.

### iii.      Legitimate Reason as Pretext

Again, however, Mr. Carmichael establishes a factual issue as to whether Verso's legitimate reason is pretextual and hides a retaliatory motive.  For example, a reasonable factfinder could conclude that the reversal in Verso's position—from a letter dated March 2007 that was shared among Verso managers and stated that "the medical department has received sufficient medical information and clarification that another return-to-work meeting can be conducted," *Powe Dep*. at 135 (Docket # 32-2), to the actual March 26, 2007 meeting in which more clarification was again demanded, leading ultimately to Verso's termination decision— could be construed as retaliation for Mr. Carmichael's MHRC complaint.

III.     **CONCLUSION**

The Court concludes that there are questions of material fact as to Mr. Carmichael's disability discrimination claims under both the ADA and the MHRA and his retaliation claims under the MHRA.  Mr. Carmichael's MWPA claims are preempted.

The Court DENIES Verso's Motion for Summary Judgment (Docket # 21) with respect to Mr. Carmichael's disability claims under the ADA and the MHRA and his retaliation claims under the MHRA.

The Court GRANTS Verso's Motion for Summary Judgment (Docket # 21) with respect to Mr. Carmichael's retaliation claim under the MWPA.

The Court DENIES Verso's Motion to Exclude the Testimony of Dr. Gordon T. Caldwell, M.D. (Docket # 22).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 5th day of January, 2010